## OGDEN v. LUND.

Before the Act of 23rd January, 1850, (Hart. Dig. Art. 1396,) there was no law
which authorized the grant of a license, by the County Court, for a ferry across
a stream which constituted a national boundary ; and that Act is operative only
so far that it provides a system of reciprocity.

It seems that one who is in the actual occupation of a ferry, though without license,
can sustain an action against another who dispossesses him without authority.

The Court is bound to know judicially the boundaries of the United States, (at
least, where they coincide with the boundaries of this State,) and when a state
of war exists between the United States and another nation.

One who, being in the exercise of a ferry privilege between the United States and
Mexico, then at war with each other, was forced to discontinue it, by a military
officer of the United States, who was in command at that place, had no right of
action against the officer ; the exercise of the ferry privilege in such a place being
inconsistent with a state of war.

Where suit was instituted before the Act of 1852, which required the statute of
limitations to be expressly relied on in the answer, was passed, and service of
process was made by publication, and there was no appearance by the defend-
ant in the Court below, the defendant was permitted to avail himself of the
benefit of the statute on error, notwithstanding the trial of the case, in the Court
below, was after the said Act of 1852.

Error from Starr.  The petition was filed February 20th,
1851.  The act complained of was done in February, 1847.
The cause was tried at the Spring Term, 1853.  The other
facts will be found in the opinion of the Court.

*Allen & Hale*, for plaintiff in error.

LIPSCOMB, J.  This suit was brought by the defendant in
error against the plaintiff in error.  The petition sets forth
that on the first day of March, 1847, petitioner was in the legal
possession of the ferry across the mouth of the Rio Grande,
established by the County Court of Nueces county, and was
regularly licensed by the said Court to run the said ferry, and
that, while he was running the ferry, the defendant, Ogden,

who was then Assistant Quarter Master of the United States army, in charge of the Quarter Master's depot at the mouth of the Rio Grande, and *ex officio* commander of the detachment there stationed, by the officers and men, under his command, on the same day, stopped and prevented the petitioner from exercising and enjoying his said right and privilege as ferryman at the mouth of the said river, and continued so to do until the expiration of the license, about eight months, whereby, he says, he was damaged twenty thousand dollars ; and he brings suit for that amount. This is the substance of the ground of action set forth in the petition. At the time the action was brought, the defendant was a non-resident, and service was effected by publication. There were a verdict and judgment for the plaintiff for thirteen thousand two hundred and fifty dollars. The case has been brought up by a writ of error, and the error relied on is, that the petition discloses no legal grounds for an action.

First, Because the County Court of Nueces county had no authority to establish a ferry across the mouth of the river Rio Grande, or to license the keeping and running the same. And second,

That the river Rio Grande was, during the time mentioned in the plaintiff's petition, a boundary line of two nations engaged in actual hostilities, and occupied by the army of the United States.

We will discuss the propositions in the order presented. The manner, in which ferries and bridges are to be established over water courses, forming county boundaries, has been defined ; but there has been no legislation upon the subject, where the river is a national boundary, and, consequently, no authority given to the County Court to establish a ferry over such streams. And we can judicially know that the Rio Grande is not a river running within the boundaries of the county of Nueces, but it is the western boundary, (or was at that time,) of that county, as well as the boundary of the State of Texas. By the first Section of the Act of the Congress of Texas,

86

19th December, 1836, (Hart. Dig. Art. 1631,) the western boundary of Texas was defined as "running from the mouth "of the Rio Grande, up the principal stream of said river, to "its source." The whole river was never claimed to be within the jurisdiction of Texas. The third Section of the Act of 23rd January, 1850, makes a provision for ferries on rivers forming a boundary to this State; (Hart. Dig. Art. 1396;) but this Act being subsequent to the injuries, for which this suit was brought, can have no influence. It provides for a system of reciprocity. And this is all that can be done in such cases by legislation. Any attempt to give a privilege or franchise beyond the jurisdiction of the State, would be void.

If, however, a person is in the possession and enjoyment of such privilege, although deriving no authority from the license issued without authority, he could not be dispossessed by one having no authority. Any deprivation of his possession, by force, would entitle him to damages, if the trespass was committed within the jurisdiction of the State. But he alleges in his petition, that the mouth of the Rio Grande was, at the time of the alleged trespass, occupied as a depot for the Quarter Master's supplies, and the trespass was committed by the officer in command of that place. And this brings us to the consideration of the second proposition.

We are bound judicially to know that the Rio Grande was the boundary between Mexico and the United States. We never claimed beyond it. And we are bound judicially to know that, at the time of the supposed injury sustained by the plaintiff in the Court below, a state of war, public and open, existed between the two countries. A war puts an end to all intercourse between the subjects of the two governments. They are not permitted to pass from the one country to the other. It is a law of war, and during its existence, the military, in actual occupation of the frontier, from the necessity of the case, must be charged with the duty of preventing such intercourse. If a private individual, on his own account and for his own gain, was permitted to run a ferry boat for passengers, with-

out the control of the military, it would afford a facility in communicating with the enemy, that might endanger our own army, and otherwise embarrass the successful prosecution of the war. Chancellor Kent, in commenting upon this subject, says : " The interdiction flows necessarily from the principle " already stated, that a state of war puts all the members of · " the two nations, respectively, in hostility to each other ; and " to suffer individuals to carry on a friendly or commercial in- " tercourse, while the two governments were at war, would " be placing the act of the government and the acts of individ- " uals in contradiction to each other. It would counteract the " operations of war, and throw obstacles in the way of the " public efforts, and lead to disorder, imbecility and trea- " son. Trading supposes the existence of civil contracts and " relations, and a reference to Courts of Justice ; and it is " therefore necessarily contradictory to a state of war. It " affords aid to the enemy, in an effectual manner, by en- " abling the merchants of an enemy's country to support their " government ; and facilitates the means of conveying intelli- " gence, and carrying on a traitorous correspondence with the " enemy." (Kent's Com. Vol. I, p. 66.) The civil authority would be wholly incapable of preventing this intercourse; and from necessity, as before said, it must be confided to the military. The stopping the running of a ferry boat across the Rio Grande, as alleged in the plaintiff's petition, is not believed to have been the capricious exercise of arbitrary power, but it would seem to be but a reasonable act, required by sound policy and a prudent regard to the faithful discharge of his duty as an officer, placed in command at that depot of the Quarter Master's stores. If the ferry had been permitted, the ferryman would have depended upon the violations of the rules of war, for his profits. And it was not only justifiable, but was eminently necessary to put a stop, on the hostile boundaries, to all improper intercourse, to remove the facilities, that had been prepared for such violations of the well established rules resulting from the war existing between the

two countries.   We believe the petition does not show a sufficient cause of action, and that the judgment should be reversed.

There was no personal service in this case, and no defence made; and in all probability, the defendant did not know of the existence of this suit, until after judgment had been rendered.   The action is to recover damages for a tort, and was barred by the statute of limitations of two years, and the suit was not commenced until near four years after the cause of action accrued, and as this suit was commenced before the passage of the Act requiring the statute to be set up by plea or exception, we believe that, in this case, it may be taken advantage of on error ; and if there had been no other ground for reversal, we should have reversed upon this ground.   It is reversed and ordered to be dismissed.

Reversed and dismissed.